```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GEORGE CARL SANTILLO, JR.,                      :
                                                :
                                Plaintiff,      :
                                                :                1:13-cv-8874-GHW
                -against-                       :
                                                :
                                                :                MEMORANDUM
CAROLYN W. COLVIN, ACTING                       :                OPINION AND ORDER
COMMISSIONER OF SOCIAL SECURITY,                :
                                                :
                                Defendant.      :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/20/2015

GREGORY H. WOODS, District Judge:

Plaintiff George Carl Santillo Jr. brought this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. The parties have filed cross-motions for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is denied, Santillo's motion is granted, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

I.  Background

  A.  Procedural History

On June 17, 2009, Santillo filed an application for disability insurance benefits, alleging disability beginning on May 5, 2009, due to bipolar disorder, moodiness, confrontational behavior, social anxiety, rage, rapid mood changes, and chronic obsessiveness. *See* Doc. 7 (Administrative Record ("AR") at 353. His application was initially denied on November 4, 2009. *Id.* at 184-87. Santillo subsequently requested a hearing before an administrative law judge ("ALJ"). After holding a hearing at which Santillo and a medical expert testified, ALJ Roberto Lebron issued an unfavorable decision on June 10, 2011. *Id.* at 166-73. By order dated December 23, 2011, the Appeals Council vacated the ALJ's decision and remanded the matter for further proceedings. *Id.* at 180-81.

On remand, ALJ Michelle S. Marcus held a supplemental hearing at which she took the testimony of Santillo and a vocational expert. *Id.* at 109-61. The ALJ issued an unfavorable decision on July 27, 2012, finding that Santillo was not disabled from his alleged onset date of May 5, 2009, through his date last insured of June 30, 2012. *Id.* at 37-48. The Appeals Council denied Santillo's request for review on March 20, 2013, rendering the ALJ's July 27, 2012 decision the final decision of the Commissioner. *Id.* at 5-7, 22-23. This action followed.

### B.   Non-Medical Evidence

At the time that he applied for disability benefits, Santillo was 25 years old; had completed high school, where he was enrolled in special education classes due to a learning disability; and had obtained a certificate in culinary training. *Id.* at 62-66, 467. Santillo had at least four years of work experience in grocery stores, and his previous job as a stock clerk spanned from late 2006 to April 2007 and involved stocking shelves. *Id.* at 63-65, 149, 354, 410. Santillo had quit his job as a stock clerk because he did not get along with his manager. *Id.* at 73, 86.

Santillo lived with his mother and grandmother. *Id.* at 371. His activities included watching television, feeding and caring for his dog, cleaning, washing dishes, doing laundry, and doing yard work. *Id.* at 133, 372-75, 399. He had no problems attending to his personal care and hygiene. *Id.* at 71, 372, 398. He would meet up with friends approximately once a week to go to the mall or to a movie, but otherwise did not participate in social activities. *Id.* at 376, 401. After his mother passed away in October 2009, Santillo also took care of his grandmother by giving her medication. *Id.* at 397. Santillo could go out alone, drive a car, and shop for personal items, but needed help budgeting and handling money. *Id.* at 144, 372-75, 399-400.

According to Santillo's own description of his symptoms, he was unable to work due to depression, rage, mood swings, and anxiety. *Id.* at 66. He also occasionally had difficulty sleeping and occasionally suffered from panic attacks. *Id.* at 78-79, 127-28. His depression sometimes made

2

it difficult for him to get out of bed or even function, he experienced rage almost every day, which could be triggered by his going out in public, and his anxiety made it difficult for him to think clearly. *Id.* at 74, 78. Medication helped relieve his depression, but would make him drowsy. *Id.* at 68, 75. As a result of his conditions and his related inability to control his emotions or handle criticism, he became very uneasy around large crowds and had problems getting along with family, friends, authority figures, and others. *Id.* at 138, 376-77. He also had difficulties focusing and paying attention, but could follow spoken and written instructions and finish what he started. *Id.* at 377. Due to his learning disability, he required a physical demonstration before he could learn a task. *Id.* at 76. He was able to perform repetitive tasks, but had difficulties with math. *Id.* at 76-77. Although he could add, subtract, multiply, and divide, he was unable to perform algebraic calculations or determine percentages. *Id.* at 77. He also had difficulties with reading comprehension. *Id.*

### C. Medical Evidence

According to the medical evidence in the record, on June 11, 2009, Santillo underwent a diagnostic review at Hudson Valley Mental Health ("Hudson Valley"). *Id.* at 443-45. Santillo reported mood swings, depression, road rage, anger, problems relating to people due to his anger, and past suicidal ideation. *Id.* at 443-44. The unnamed reviewing professional diagnosed Santillo with Bipolar II disorder, assigned him a Global Assessment of Functioning ("GAF") score of 55,[1] and noted that he had good family support and was motivated to receive help. *Id.*

On July 22, 2009, Dr. Nilo Hererra of the Mount Kisco Medical Group completed a treatment questionnaire regarding Santillo for the New York State Office of Temporary and

---

[1] According to the Commissioner, a GAF score reflects a clinician's judgment of an individual's overall level of functioning, and a GAF score of between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. Doc. 15 at 5 n.3. According to Santillo, GAF scores are no longer used as a diagnostic tool in the Diagnostic and Statistical Manual of Mental Disorders due to their questionable probative value. Doc. 19 at 3 n.7.

3

Disability Assistance. *Id.* at 469-80. Dr. Hererra had been seeing Santillo on a monthly basis since May 5, 2009. *Id.* at 469. Dr. Hererra described Santillo's symptoms as racing thoughts, depression, and difficulty controlling his temper, and diagnosed him with insomnia and depression. *Id.* Dr. Hererra had previously prescribed Zoloft to Santillo and noted that his symptoms had improved as a result. *Id.* at 470. Dr. Hererra reported that Santillo had no limitations in his abilities to lift, carry, sit, stand, walk, push, or pull, but was limited with respect to his understanding and memory, sustained concentration and persistence, and social interaction. *Id.* at 477-78.

In or around June 2009, Santillo began treatment with Dr. Deborah Chung, a psychiatrist. Dr. Chung conducted a psychiatric evaluation of Santillo on July 30, 2009. *Id.* at 466. She noted that Santillo complained of anger, irritability, lack of motivation, and difficulty sleeping. *Id.* Santillo reported that his depressive symptoms had begun two or three years earlier after the death of his paternal grandfather and his grandmother's admission to a nursing home; that he experienced mood changes, anger, irritability, and rage, but was not physically violent; and that Zoloft was helping to relieve his symptoms. *Id.* Santillo also reported that he had quit his previous job due to irritability and impatience with customers. *Id.*

According to Dr. Chung's treatment notes, Santillo was cooperative with good eye contact and had an appropriate affect and neutral mood, but had increased psychomotor activities and was fidgety and tense. *Id.* at 467. Santillo's speech was over-productive, rapid, and pressured, but coherent and relevant with no thought disorders. *Id.* His memory for recent and remote events was intact, his insight and judgment were fair, and he seemed to be functioning with low average intelligence. *Id.* When manic, Santillo could become angry and hit someone without thinking of the consequences, though he strongly denied any intention to do so. *Id.* Dr. Chung diagnosed Santillo with Bipolar I Disorder. *Id.*

On August 27, 2009, Santillo reported to Dr. Chung that he was doing well on Zoloft without any adverse reactions, that group therapy was helping him cope with conflict at home, and that he was neither depressed nor elated. *Id.* at 561. The following month, Santillo reported that he was doing fairly well most of the time, that he was not depressed, and that he had been taking Zoloft without adverse effects. *Id.* at 562.

In an October 12, 2009 therapy session with Carol Randazzo, a licensed medical social worker, Santillo stated that he was feeling anxiety over his mother being in intensive care with pneumonia. *Id.* at 491. In an October 21, 2009 therapy session, Santillo stated that his mother had died and that his mother's boyfriend and aunts had been supportive. *Id.* at 488. He denied any suicidal or homicidal ideation. *Id.*

On November 2, 2009, Dr. A. Herrick, a State agency psychological consultant, completed a Psychiatric Review Technique form in connection with Santillo's claim. *Id.* at 502-12. Dr. Herrick indicated that Santillo had Bipolar II Disorder and found that he had moderate limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; mild limitations in performing activities of daily living; and one or two episodes of decompensation of extended duration. *Id.* at 505, 512.

Dr. Herrick completed a mental residual functional capacity assessment on the same date. *Id.* at 497-98. Dr. Herrick concluded that Santillo was not significantly limited in his abilities to remember work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior

5

and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. AR at 497-98. Dr. Herrick also concluded that Santillo was moderately limited in his abilities to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. *Id.* In support of his findings, Dr. Herrick noted that Santillo had no history of psychiatric hospitalizations and that there was evidence that Santillo's condition had improved since he began outpatient treatment. *Id.* at 499. Dr. Herrick noted that Santillo may have difficulties dealing with money due to his problems with math. *Id.* Dr. Herrick concluded that the evidence did not support a finding that Santillo had marked impairments. *Id.*

On November 23, 2009, Santillo reported to Dr. Chung that he was having difficulty coping with his mother's death and requested an increase in his Zoloft, but denied any suicidal thoughts. *Id.* at 564. On February 1, 2010, Santillo reported to Dr. Chung that he was feeling better but had previously had suicidal ideas with urges to take more medication than he was prescribed. *Id.* at 568. Santillo agreed to have his medications limited to 15-day supplies and denied any current suicidal ideation. *Id.* On April 12, 2010, Santillo told Dr. Chung that he was no longer having suicidal thoughts that that he was coping well with his stressful living situation. *Id.* at 570. Dr. Chung indicated that Santillo's affect was brighter and that his mood was normal. *Id.*

On May 20, 2010, Dr. Chung and Ms. Randazzo completed a psychological/mental impairment functional capacity assessment of Santillo. *Id.* at 540-45. Dr. Chung and Ms. Randazzo indicated that Santillo had been attending group therapy once a week, individual therapy twice a month, and medication management sessions once or twice a month. *Id.* at 540. They stated that

Santillo had bipolar disorder, a GAF score of 55, and that his symptoms included the following: poor memory; sleep disturbance; personality change; mood disturbance; emotional liability; recurrent panic attacks; anhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty thinking or concentrating; recent suicidal ideation; oddities of thought, perception, speech, or behavior; social withdrawal or isolation; decreased energy; manic syndrome; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and hostility and irritability.  *Id.* at 540-41.  They also stated that Santillo experienced severe mood swings, irritability, and angry outbursts, and at times was too depressed to leave his house.  *Id.* at 541.

According to Dr. Chung's and Ms. Randazzo's assessment, Santillo had difficulty with relationships and maintaining employment prior to beginning treatment.  *Id.* at 541-42.  Santillo did not have a low IQ or reduced intellectual functioning.  *Id.*  Dr. Chung and Ms. Randazzo estimated that, on average, Santillo would miss work more than three days per month due to his impairments.  *Id.* at 542.

Dr. Chung and Ms. Randazzo also assessed Santillo's functional abilities.  *Id.* at 543-45.  They indicated that Santillo had poor or no ability to remember work-like procedures; maintain attention for a two hour segment; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without an interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; interact appropriately with the general public; and maintain socially appropriate behavior.  *Id.* at 543-44.

They indicated that Santillo had an inadequate ability to understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; adhere to basic standards of neatness and cleanliness; and use public transportation. *Id.* Finally, they indicated that Santillo had marked limitations in participating in activities of daily living; extreme limitations in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings. *Id.* at 544.

In a letter dated October 25, 2010, Dr. Chung and Ms. Randazzo stated that Santillo's depression and anxiety had increased after his mother passed away and, more recently, after his car was repossessed and his house was put up for sale. *Id.* at 524. They reported that Santillo had moved into the group home for disabled adults in which his father was living. *Id.* Dr. Chung and Ms. Randazzo opined that Santillo was unable to work at that time. *Id.*

Santillo continued to see Dr. Chung for medication management on a monthly basis throughout 2010 and the early part of 2011. *Id.* at 572-85. *Id.* Santillo consistently denied having suicidal thoughts or experiencing adverse effects from his medication. *Id.* at 572, 574-80, 583, 585. The records from this time period also contain Santillo's reports that (1) he was doing fairly well and was not severely depressed or anxious (June 28, 2010); (2) he had good days and bad days (July 26, 2010); (3) he was living with his father and stepmother, his relationships with them were "okay," and the medication Abilify was helping his depression (August 26, 2010); (4) he was adjusting fairly well to living with his father, he was compliant with his medication, his mood was stable without any depression, and his anxiety and sleeping had improved (September 20, 2010); (5) he was doing well without any depression, anxiety, or insomnia, but was sad due to the upcoming holidays (November 15, 2010); (6) he had run out of medication due to issues with his Medicaid and was irritable and

8

anxious (January 10, 2011); (7) he was stressed because he had to rely on others for transportation (February 24, 201); and (8) he was anxious due to his upcoming disability hearing but was otherwise doing well (April 7, 2011).  *Id.* at 572-85.

On March 27, 2012, Hudson Valley completed a mental health treatment plan review that was signed by Ms. Randazzo, Dr. Richard Miller, and Liza Bove.  *Id.* at 592-600.  In the review, Santillo reported experiencing anxiety due to his living situation with his father and not having access to public transportation, and continued to report suffering from mood swings, depression, anger, and road rage.  *Id.* at 592, 597.  He also reported spending time with friends who were supportive.  *Id.* at 592.  The review stated that Santillo was not willing to look for a job or attend vocational training, despite the fact that his psychiatrist and therapist had suggested that he begin working part-time and attending vocational training.  *Id.*

### D. Medical Expert Testimony

At Santillo's first hearing, the ALJ took the testimony of Dr. Chukwuemeka Efobi,[2] a psychiatric medical expert.  *Id.* at 80.  Prior to testifying, Dr. Efobi reviewed the medical evidence in the record, listened to Santillo's testimony, and asked Santillo questions at the hearing.  *Id.* at 80-81.  In response to Dr. Efobi's questions, Santillo stated that he had never stayed in an emergency room or been admitted to a psychiatric hospital; that he was taking Abilify, Zoloft, Trazodone, and Hydroxyzine, but had not been prescribed a mood stabilizer; and that he had been doing better since February 2010, but still was not "one hundred percent."  *Id.* at 81-84.

According to Dr. Efobi, from the alleged onset date of May 5, 2009, through February 1, 2010, Santillo had an impairment that met or equaled the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings").  *Id.* at 88-89.  Dr. Efobi determined that, during that time period, Santillo had moderate-to-marked difficulties in maintaining social

---

[2] Dr. Efobi is incorrectly referred to as "Dr. Rafobe" in the hearing transcript.

functioning, and moderate-to-marked difficulties in maintaining concentration, persistence, or pace. *Id.* at 87-88.

Dr. Efobi concluded, however, that Santillo's impairments did not satisfy the criteria of the Listings after February 1, 2010. *Id.* at 90. In support of this conclusion, Dr. Efobi stated that the medical evidence beginning with Dr. Chung's February 2010 treatment report was not indicative of any significant symptoms other than mild anxiety due to an upcoming SSI hearing. *Id.* at 89. Dr. Efobi concluded that Santillo had been "stable" since around that time. *Id.* at 91. Dr. Efobi also noted that Santillo was prescribed only two milligrams of Abilify, which was a very small dose that would not be effective in treating mania or anger issues. *Id.* at 97-98. Furthermore, according to Dr. Efobi, if Santillo did indeed have bipolar disorder with serious mania, then he should have been prescribed a mood stabilizer, in addition to the other medications he was taking. *Id.* at 97. Dr. Efobi ultimately concluded that Santillo was able to handle full-time work. *Id.* at 107.

### E. Vocational Expert Testimony

At Santillo's second hearing, the ALJ took the testimony of Josiah Pearson, a vocational expert ("VE"). The ALJ asked the VE to assume that there was a hypothetical individual of the same age and with the same education and work experience as Santillo who could work at all exertional levels, but who could perform only simple, repetitive, and routine tasks in a job that did not require handling money and that required only occasional decision-making, occasional changes in the work environment, and occasional interactions with coworkers and the public. *Id.* at 149-50. The VE testified that such an individual would be unable to perform Santillo's past work as a stock clerk. *Id.* at 150. According to the VE, however, such an individual could work as a mail clerk, a cleaner, or a cleaner in an industrial setting. *Id.* at 151-52.

The ALJ also asked the VE to assume that there was a hypothetical individual of the same age and with the same education and work experience as Santillo who could work at all exertional

levels, but who could perform only simple, repetitive, routine, one-to-two step tasks in an isolated work environment that did not involve fast-paced production requirements, interaction with the public, or handling money, and that involved only simple work-related decisions, few, if any, workplace changes, and only occasional supervision. *Id.* at 154-55. The VE testified that such an individual could not perform Santillo's past work as a stock clerk, but could perform the same three jobs identified above. *Id.* at 155.

## II. Legal Standards and ALJ Decision

### A. Scope of Judicial Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ may be set aside only if it is based on legal error or is not supported by "substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). The Supreme Court has defined "substantial evidence" in social security cases as "more than a mere scintilla," but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NRLB*, 305 U.S. 197, 229 (1938)). As the Second Circuit has observed, this is "a very deferential standard of review-even more so than the 'clearly erroneous' standard." *Brault v. Social Security Administrator*, 683 F.3d 443, 448 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. The Court must not make a *de novo* determination of disability. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 1995) ("[W]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."). This is true even when contrary evidence supports the

plaintiff's position. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("[W]here there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182–83 (2d Cir. 1998) (affirming ALJ decision where substantial evidence supported both sides).

**B.     Disability Determination**

A person is considered disabled for Social Security benefit purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such a severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Social Security Act regulations require the Commissioner to undertake a five-step sequential analysis in making disability determinations. 202 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a 'severe impairment' that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998); 202 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden as to the final step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998). The Commissioner must consider the entire record, including any objective medical evidence, medical opinions based on such evidence, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience. *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

### C. The ALJ's Decision

On July 27, 2012, the ALJ issued a written decision denying Santillo's application for disability insurance benefits. AR at 37-48. The ALJ first determined that Santillo last met the insured status requirement under the Act on June 30, 2012. *Id.* at 39. Next, at step one of the sequential analysis, the ALJ determined that Santillo had not engaged in substantial gainful activity from his alleged onset date of May 5, 2009, through his date last insured of June 30, 2012. *Id.* at 39. At step two, the ALJ found that Santillo's bipolar disorder constituted a "severe impairment." *Id.* At the third step, the ALJ determined that Santillo's impairments did not meet or equal the criteria of an impairment in the Listings for a continuous period of at least 12 months. *Id.* at 40-42.

At the fourth step, the ALJ concluded that, during the relevant time period, Santillo had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but could perform only simple, repetitive, routine, one-to-two step tasks in an isolated work environment that did not involve fast-paced production requirements, interaction with the public, or handling money, and that involved only simple work-related decisions, few, if any, work-place changes, and only occasional supervision. *Id.* at 42-46. In reaching this conclusion, the ALJ declined to give controlling weight to Dr. Chung's May 2010 assessment of Santillo's functional capacities, which indicated that Santillo had poor or no ability to perform the vast majority of tasks

13

involved in unskilled work. *Id.* at 45. The ALJ found that Dr. Chung's assessment was not well supported by the medical evidence or Dr. Chung's own observations of Santillo. *Id.* Additionally, the ALJ found that Santillo's testimony concerning the intensity, persistence, and limiting effects of his symptoms was not credible to the extent that it was inconsistent with the above RFC determination. *Id.* at 43-44.

The ALJ determined that, in light of his limitations, Santillo was unable to perform his past relevant work as a bagger and stock clerk. *Id.* at 46. At the fifth step, however, the ALJ found that, based on Santillo's vocational profile and RFC and the testimony of the VE, Santillo was capable of making an adjustment to other jobs that existed in significant numbers in the national economy; namely, to the jobs of a cleaner, industrial cleaner, or mail clerk. *Id.* at 47-48. The ALJ thus concluded that Santillo was not disabled under the Act. *Id.* at 48.

**III. Discussion**

In his motion, Santillo argues that the ALJ did not sufficiently support her RFC determination or her decision to reject Dr. Chung's opinion regarding his RFC. *See* Doc. 19 ("Santillo Mot.") at 9-18. Santillo also argues that the ALJ did not properly evaluate his credibility. *Id.* at 15-18. The Court agrees with Santillo's first argument for the reasons described below.

A claimant's RFC "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). In assessing the RFC, the ALJ must consider all of the "medically determinable impairments" and "all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(2)-(3), 416.945(a)(2)-(3). Generally, "[b]ecause an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010).

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). "In order to override the opinion of the treating physician, . . . the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *accord* 20 C.F.R. § 404.1527(c). More generally, the Commissioner is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2).

Here, in rejecting Dr. Chung's May 2010 RFC assessment and making her own RFC determination, the ALJ stated that (1) Dr. Chung had previously indicated that Santillo's memory was not impaired, that he was capable of working part-time, and that he was dealing well with various stressors in his life; (2) Santillo had demonstrated that he was capable of maintaining regular attendance at his therapy sessions; (3) Santillo was able to complete daily activities such as cleaning and doing laundry; (4) Santillo reported going out with a friend approximately once per week; (5) the record suggested that medication was helping to alleviate Santillo's depression; (6) Santillo's irritability and difficulty getting along with others had never resulted in his getting into a fight; and (7) Santillo had never been hospitalized for his symptoms. *Id.* at 44-46.

Apart from a handful of stray observations made by Dr. Chung herself, the ALJ did not cite any medical opinion or other medical evidence that directly supports her determination that, contrary to Dr. Chung's assessment, Santillo has the RFC to perform a full range of work at all exertional levels, but can perform only simple, repetitive, routine, one-to-two step tasks in an

15

isolated work environment that does not involve fast-paced production requirements, interaction with the public, or handling money, and that involves only simple work-related decisions, few, if any, work-place changes, and only occasional supervision.  Rather, the ALJ essentially concluded that Dr. Chung's opinion as to Santillo's RFC was inconsistent with Dr. Chung's own observations and treatment notes.  The ALJ thereby improperly substituted her own lay opinion for the opinion of a physician.  *See, e.g., Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (internal quotation marks omitted)); *see also Filocomo v. Chater*, 944 F.Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").  Stated differently, based on Dr. Chung's own treatment notes and on certain non-medical evidence, the ALJ appeared to infer that Santillo had a particular RFC different than the RFC arrived at by Dr. Chung.  Such an inference was impermissible and leads the Court to conclude that the ALJ's RFC determination is not supported by substantial evidence.  *See, e.g., Walker v. Astrue*, No. 08-CV-0828(A)(M), 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) ("[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.  Where the medical findings in the record merely diagnose [the] claimant's . . . impairments and do not relate these diagnoses to specific residual functional capabilities . . . [the Commissioner may not] make the connection himself." (internal quotation marks omitted)), *report and recommendation adopted*, No. 08-CV-828A, 2010 WL 2629821 (W.D.N.Y. June 28, 2010).

  The Court recognizes that, under certain circumstances, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Wilson v.*

*Colvin*, No. 13-CV-6286P, 2015 WL 1003933, at *21 (W.D.N.Y. Mar. 6, 2015) (internal quotation marks omitted).  The Court also recognizes that there appears to be medical opinion evidence in the record not cited in the relevant portion of the ALJ's decision that is inconsistent with Dr. Chung's RFC assessment and that at least indirectly supports the ALJ's RFC assessment.  *See* AR at 80-107 (testimony of Dr. Efobi), 497-99 (Dr. Herrick's November 2009 RFC assessment).[3]  The Court, however, is unable to conclude that this is the rare case in which the ALJ could permissibly base her RFC assessment on a common sense judgment without a physician's assessment, especially given that the Commissioner has not raised this argument in her motion papers.  Additionally, for the reasons set forth above, the ALJ did not articulate sufficiently "good reasons" for rejecting certain aspects of Dr. Chung's RFC assessment, even assuming, *arguendo*, that such reasons can be independently located in the record.

IV.   Conclusion[4]

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, Santillo's motion for judgment on the pleadings is granted, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.  The Clerk of Court is instructed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated:  April 20, 2015  
New York, New York

GREGORY H. WOODS  
United States District Judge

---

[3] The Court cautions, however, that there is no indication that Dr. Efobi or Dr. Herrick examined Santillo, and that "the opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians."  *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986).

[4] Given that remand is warranted for the reasons set forth above, the Court declines to address Santillo's argument that the ALJ improperly assessed his credibility.